IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 95-50491
Summary Calendar
_____


MARY KECKLEY

                    Plaintiff - Appellant

        v.

THE UNIVERSITY OF TEXAS AT EL PASO

                    Defendant - Appellee

_____

Appeal from the United States District Court
for the Western District of Texas
**(EP-94-CV-148)**
_____
**June 21, 1996**
Before KING, GARWOOD, and DENNIS, Circuit Judges.

PER CURIAM:[*]

    Mary Keckley brought suit under Title VII against the

University of Texas at El Paso.  She appeals the district court's

granting of UTEP's motion for judgment as a matter of law.  We

_____

        [*]    Pursuant to Local Rule 47.5, the court has determined
that this opinion should not be published and is not precedent
except under the limited circumstances set forth in Local Rule
47.5.4.

1

affirm.

## I.  BACKGROUND

Keckley was employed by UTEP as an Associate University Librarian.  She was dismissed from her position in 1993.  UTEP maintains that Keckley was dismissed because of her attitude and job performance.  Keckley claims that she was dismissed because she protested an order by UTEP administrators to implement an improper hiring practice.

Dr. John Bruhn, UTEP's Vice President for Academic Affairs, testified that in October 1991 he became aware of employee dissatisfaction in the library.  In a memo to Dr. Roberto Villarreal, Associate Vice President for Academic Affairs, dated June 23, 1992, Bruhn stated that he felt that Keckley might be causing problems in the library and he asked Villarreal to investigate the situation.  In this memo, Bruhn also introduced the idea of hiring an Hispanic to fill a vacant library administrative position and he asked Villarreal to mention this to University Librarian Robert Seal.[1]

---

[1]      Bruhn's hand-written note read as follows:

6/23
Roberto Villarreal

(1) At the Directors meeting yesterday there was a
great deal of discussion about the library's lack of a
Hispanic in their higher administration.  At present
Bob Seal has a[n] ad out to fill a higher level vacancy
-- it was the expressed feeling of the group that if he

Keckley was a member of the search committee appointed to evaluate applicants for the vacant position. On June 24, 1992, Villarreal sent a memo to Seal--Keckley's immediate supervisor--informing him that the vacant library administrative position should be filled by an Hispanic. When Keckley was told that the committee could not consider anyone who was not of Hispanic origin, she objected to this directive and told Seal that she believed it to be unlawful. Keckley testified that she complained to Seal about the directive between six and twelve times. After that, however, she did not bring up the subject again. Rather, she participated in the hiring process as it proceeded in accordance with the directive. Keckley did not complain to anyone other than Seal about the directive and she did not complain in writing or make use of the university's grievance process.

During Villarreal's investigation of the library, he spoke with sixteen library employees. The job assignments of the

---

cannot find a Hispanic he should not fill the position -- would you call him and discuss this concern --

(2) Sunday, when I was at the library, Juan Sandoval, pulled me aside to discuss his dissatisfaction with "how things are going at the library" -- apparently with Bob Seal's not feeling well, Mary Keckley has assumed more control in running the library -- she does not have good people skills and I guess is causing problems -- could you do some detective work (and maybe visit with Juan Sandoval and others as you see fit) -- we need to get to the bottom of what the problem is and what we can do about it --    Thanks
                                                John

3

people he spoke with ranged from upper-level administration to non-professional positions. Villarreal received certain negative comments about Keckley and other library administrators.[2] In a report to Bruhn dated August 17, 1992, Villarreal stated, <u>inter alia</u>: "It seems embarrassingly clear that Mary Keckley is unfit to lead. . . . No member of the library has a kind word to say about her administrative skills. . . . [T]o the contrary, Keckley has (perhaps unintentionally) greatly contributed to an environment of fear and horror." Villarreal also was critical of Seal and two other top library administrators, Gary Ives and Mary Kelley.[3]

After reviewing Villarreal's report, Bruhn sent a memo to Seal summarizing his concerns. On October 1, 1992, Seal submitted a detailed plan for rectifying the problems in the

---

[2]  The notes taken by Villarreal during his investigation reflected that some employees felt Keckley was "too authoritarian" and that she created an "ambiance of distrust" and "suspicion." Other comments recorded in the notes indicated that some of the employees believed that Keckley was the "biggest problem" and that she "created a climate of stress."

[3]  Villarreal found that the library had "poor, insensitive and sometimes heavy-handed" leadership at the top, a "constant turnover of personnel," and a "lack of Hispanic representation." Villarreal evaluated Ives, in particular, as one who is "highly feared and disliked" and "seems not to fit into a leadership position."

library and Bruhn approved it.[4]  As part of his plan, Seal visited with and interviewed more than thirty members of the library staff, including Keckley and Ives.

Keckley was Ives's primary supervisor and Seal turned to her for assistance in dealing with Ives.  Ives had not only been the subject of criticism by staffers who spoke with Villarreal, but in August 1992 a complaint against him was filed with UTEP's equal opportunity office.[5]  Keckley testified that she knew that Ives was being counseled by Seal and that they were unhappy with each other.  She told Seal that she did not agree with the way he was handling Ives.

On November 23, 1992, Sebastian Diaz, an Hispanic, was selected to fill the vacant administrative position in the library.  In December 1992, Seal concluded the staff interviews he had undertaken as part of his plan to rectify problems in the

---

[4]     At trial, Bruhn testified that among the eight strategies outlined by Seal were the following:

> 1 was to meet with library administrators, Keckley and Kelley, to plan a strategy for changing staff perceptions that administration is sometimes autocratic and insensitive. . . .  Strategy 3, meet with the entire staff individually to candidly ask what's right and what's wrong with the library and ask for their suggestions.  Strategy 4, meet with department and section heads and stress the importance of listening to staff and seeking their input on issues.

[5]     Library employee Armando Dominguez charged Ives with discriminating against Hispanics.  Rebecca Salcido, director of UTEP's equal opportunity office, investigated the complaint. Although she determined that a number of employees were unhappy with Ives and Keckley, she found no evidence of discrimination.

library.  On January 6, 1993, Seal notified Keckley in a letter that her employment would not be renewed in August 1993.  Seal testified that the decision not to renew Keckley's employment was made by him alone.  He justified his decision by explaining that he and Keckley were "no longer an adequate working team."  Seal informed Bruhn that Keckley was not a team player and that she was in part responsible for problems in the library.  He wrote to Dr. Diana Natalicio, UTEP's president, that Keckley should not be renewed because of her "negativity" and lack of "interpersonal" skills.

On May 12, 1994, Keckley filed an original complaint against UTEP in the United States District Court for the Western District of Texas.[6]  Asserting that her employment with UTEP had been terminated in retaliation for her "advocacy of rights of protected racial groups," Keckley sought declaratory relief and money damages pursuant to 42 U.S.C. §§ 1981, and 2000d & 2000e (Titles VI and VII).

UTEP moved for summary judgment arguing, inter alia, that Keckley had established no causal connection between her participation in a protected activity and UTEP's decision not to renew her employment.  The district court granted in part and denied in part UTEP's motion for summary judgment.  The court

---

[6]    Keckley amended her complaint to add President Natalicio as a defendant but later agreed to dismiss Natalicio from the suit.  Keckley also did not restate previously asserted state law claims in her amended complaint.

dismissed Keckley's Title VI claim, but allowed her Title VII retaliation claim to proceed to trial.

The case went to trial before a jury on June 5, 1995. The next day, after Keckley had closed her case in chief, UTEP moved for judgment as a matter of law and the district court granted the motion. On June 7, 1995, the district court entered judgment denying Keckley's claim. Keckley timely filed a notice of appeal.

## II. ANALYSIS

We review the district court's ruling on a motion for judgment as a matter of law de novo, applying the same legal standard as did the trial court. Conkling v. Turner, 18 F.3d 1285, 1300 (5th Cir. 1994); Omnitech Int'l, Inc. v. Clorox Co., 11 F.3d 1316, 1322-23 (5th Cir.), cert. denied, 115 S. Ct. 71 (1994). Judgment as a matter of law is proper after "a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to have found for that party with respect to that issue." Fed. R. Civ. P. 50(a). In evaluating such a motion, we view the entire trial record in the light most favorable to the non-movant and draw all inferences in its favor. Conkling, 18 F.3d at 1300; Omnitech, 11 F.3d at 1322-23. "The decision to grant a directed verdict is not a matter of discretion, but a conclusion of law based upon a finding that

7

there is insufficient evidence to create a fact question for the jury." Conkling, 18 F.3d at 1300; Omnitech, 11 F.3d at 1322-23 (citations, ellipsis, and internal quotation marks omitted).

The Supreme Court set forth the basic order of proof in discrimination cases brought under Title VII of the Civil Rights Act of 1964 in McDonnell Douglas Corp. V. Green, 411 U.S. 792 (1973). In a Title VII retaliation case, as in any other action in which the plaintiff seeks to enforce rights under a statute, the plaintiff is required to carry the initial burden of establishing facts sufficient to warrant recovery. Armstrong v. City of Dallas, 997 F.2d 62, 65 (5th Cir. 1993). A plaintiff establishes a prima facie case by demonstrating that: (1) she participated in a statutorily protected activity; (2) she was the object of an adverse employment action; and (3) there was a causal connection between the protected activity and the adverse action. Id.

Once the prima facie case is established, a rebuttable presumption, or inference, of discrimination arises. Id. ("More recently the [Supreme] Court has described this as an inference."). At this point, under the burden-shifting framework established in McDonnell, the defendant bears the burden of articulating a legitimate, nondiscriminatory business reason for the challenged action. Mayberry v. Vought Aircraft Co., 55 F.3d 1086, 1089 (5th Cir. 1995). If the defendant demonstrates such a reason, the burden shifts back to the plaintiff to prove by a

8

preponderance of the evidence that the defendant's proffered reasons were a pretext for retaliation. Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 253 (1981); Grizzle v. Travelers Health Network, Inc., 14 F.3d 261, 267 (5th Cir. 1994).

In the instant case, the parties agree that Keckley met the first two elements of a prima facie case under Title VII. A directive to exclude all job applicants except Hispanics from consideration for the vacant library administrative position would be improper. Keckley's objection to such a hiring policy satisfied the first element--that she participated in a statutorily protected activity. The decision not to renew Keckley's employment met the second element--that Keckley was the object of an adverse employment action. UTEP contends, however, and the district court agreed, that Keckley failed to satisfy the third element of the prima facie case: She failed to show a causal connection between her objection to the hiring directive and UTEP's decision not to renew her employment. Keckley argues on appeal that the circumstantial evidence presented at trial established the necessary causal connection for a prima facie case.

We need not address this issue, however, because we find that Keckley ultimately failed to present evidence sufficient to convince a reasonable finder of fact that UTEP's proffered reasons for Keckley's dismissal were pretextual. Assuming that Keckley established a prima facie case, UTEP had "the burden of

9

producing evidence that the adverse employment actions were taken for a legitimate, nondiscriminatory reason." St. Mary's, 113 S. Ct. at 2747 (citation and internal quotation marks omitted). UTEP met their burden of production by offering a legitimate reason for the decision not to renew Keckley's employment: UTEP maintained that Keckley was discharged because she did not support Seal in his efforts to remedy the morale problems in the library and, in particular, because she opposed his handling of Ives.[7]

"[W]here, as here, the employer offers a legitimate, nondiscriminatory explanation for the adverse action, the burden is on the employee to show that the explanation is merely a pretext for discrimination." Armstrong, 997 F.2d at 67. To show that the proffered explanation was pretextual Keckley was required to show that "but for" her objection to the improper hiring directive she would not have been discharged. Ray v. Tandem Computers, Inc., 63 F.3d 429, 435 (5th Cir. 1995). Keckley was required to show that her protected activity was a "significant factor" in UTEP's decision not to renew her.

---

[7] UTEP satisfied its burden of production, notwithstanding the fact that the district court granted UTEP's motion for judgment as a matter of law after the close of Keckley's case in chief and before the presentation of UTEP's case in chief. See McDaniel v. Temple Indep. Sch. Dist., 770 F.2d 1340, 1346-47 n.3 (5th Cir. 1985) ("The defendant can produce its legitimate [nondiscriminatory] reason during the plaintiff's case either through adverse witnesses, express statements by the plaintiff, or documentary evidence.").

10

<u>Walsdorf v. Board of Comm'rs</u>, 857 F.2d 1047, 1052 (5th Cir. 1988) (citations omitted).  The ultimate issue is whether there was sufficient evidence for a reasonable finder of fact to conclude that Keckley's opposition to Seal and the ill will she had engendered among many of the library staffers were pretexts, and that the true reason for her dismissal was retaliation for her complaints to Seal about the hiring directive.  <u>Grizzle</u>, 14 F.3d at 267.

A review of the entire record convinces us that no reasonable factfinder could find that the reasons offered by UTEP were pretexts for discrimination.  Keckley testified that she voiced her opposition to the hiring directive only to Seal, that Seal agreed with her concerns, and that after her initial opposition she participated in the hiring process without further complaint.[8]  Moreover, Keckley's complaints about the hiring directive were predated by Bruhn's June 23, 1992 memo to Villarreal noting employee dissatisfaction with Keckley:  "Mary Keckley . . . does not have good people skills and I guess is

---

[8]    Keckley testified that she did not complain in writing or avail herself of UTEP's established grievance process.  She did not make her concerns known to Bruhn, Villarreal, Salcido, or President Natalicio.

Furthermore, by the time Keckley was notified that her employment would not be renewed, the hiring decision had been moot for six weeks and neither Seal or anyone else at UTEP had any reason to fear that Keckley would interfere with the hiring process:  On November 23, 1992, Diaz was selected by the search committee to fill the vacant administrative library position; Keckley was notified in January 1993 that her employment would not be renewed.

causing problems."  In a letter to President Natalicio explaining his reasons for not renewing Keckley's employment, Seal stated: "Her [Keckley's] negativity and interpersonal skills have created a great deal of ill will among the library staff."[9]  Considerable evidence adduced at trial indicated that Keckley was disliked by a number of library staffers.[10]  Furthermore, Keckley testified

---

[9]    Seal testified that he decided not to renew Keckley's employment because she did not support him, he felt she was not happy, third parties had complained about her, and he was not getting along with her personally.

[10]    Salcido, director of UTEP's equal opportunity office, testified that she received comments from administrative employees of the library about the "heavy handedness" of Keckley.

Admitted into evidence was Bruhn's note to Villarreal dated June 24, 1992, including the passage about Juan Sandoval's dissatisfaction with the way Keckley was running the library in Seal's absence.  Additionally, Bruhn testified that Salcido sent him a copy of her report expressing "great concerns about the problems in the library that related to the management of the library."

Notes taken during Villarreal's interviews with sixteen library staffers were admitted at trial.  As read by Villarreal during his testimony, the notes reflected that:  Esperanza Morena described Keckley's management style as "[a]uthoritarian, creating an ambience of distrust, suspicion."  Jim Crouch felt, "[t]hat she got threatened easily. . . .  That she was indecisive."  Tony Rodarte noted in Keckley an "[u]nwillingness to change. . . .  Wants her way only . . . .  Hard to approach." According to John Wayne Smith, "She never admitted fault.  Her errors were passed to others."  Mary Genesk felt that Keckley "was conceded, ugly, unchristian.  Very picky.  Makes people feel nervous."  B. J. Albert noted that "[s]he carried grudges.  Once you make a mistake, she never forgets.  She has everyone in fear."  Juan Gonzales felt that "[Keckley] was the biggest problem [in the library]. . . .  There is no way to turn to her for solutions to problems. . . .  People were afraid of her." Armando Dominguez said "[t]hat Ms. Keckley made their lives miserable."

Villarreal's report to Bruhn dated August 17, 1992, admitted into evidence at trial, included the following findings regarding Keckley:

12

that she was not supportive of Seal in his attempts to work out problems with Ives.

We have stated that judgment as a matter of law "is appropriate in the employment retaliation context when the jury could improperly draw inferences that are mere speculation." Grizzle, 14 F.3d at 268-69 (affirming judgment notwithstanding the verdict in favor of employer where employee failed to establish that her discharge was in retaliation for her alleged complaints of illegal discrimination). The instant case is an example of such a situation.[11] We find insufficient evidence that but for Keckley's opposition to the hiring directive, UTEP

---

It seems embarrassingly clear that Ms. Keckley is unfit to lead. Her approach with dealing with personal problems has proven disastrous, and it seems that she operates in a state of fear and suspicion. It is unfortunate, but no member of the library has a kind word to say about her administrative skills. To the contrary, Keckley has (perhaps unintentionally) greatly contributed to an environment of fear and horror. Certainly the creation of a "reign of terror" lies with Seal and her.

[11] We agree with the following determination of the district court:

It's [Keckley's] burden by a preponderance of the evidence to prove that, but for what she describes as her protest or complaint about an illegal employment policy or practice, that she would have had her contract renewed. And there is basically no evidence of that in my view, or if there is any, it's so insufficient it's not enough to even go to the jury. Even though it is unusual and somewhat extraordinary to grant a motion for judgment as a matter of law without letting the jury deliberate, this is one of those rare cases where it should be done.

13

would have renewed her employment.  We conclude, therefore, that Keckley cannot prevail on her Title VII claim because she failed to demonstrate that UTEP's articulated reasons for discharging her were pretextual.

### III.  CONCLUSION

For the foregoing reasons, we AFFIRM the judgment of the district court.

14